FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

2009 OCT 30 PM 3: 38

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA

UNITED STATES OF AMERICA

v.

MILDRED ANN RUSSELL

Case No.: 3:09-cr-344-J-32TEM
Ct. 1: 18 U.S.C. § 371
Forfeitures: 18 U.S.C. §§ 981(a)(1)(C)
& 982(a)(2)(A)
28 U.S.C. § 2461(c)

## INFORMATION

The United States Attorney charges:

### COUNT ONE

#### A. Introduction

At all times material to this Information, unless otherwise specified:

1. A Uniform Residential Loan Application, commonly referred to as a mortgage loan application or a Form 1003, is a universally used mortgage loan application developed by federal government agencies that is utilized by financial institutions and other lenders in the mortgage loan approval process. The Form 1003 requires the borrower to submit his or her financial history, including employment information, monthly income, assets and liabilities, and the specific details of the residential real estate transaction.

2. A HUD-1 Settlement Statement is a United States Department of Housing and Urban Development form that is universally used in the closings of residential real estate transactions in the United States. A HUD-1 is used to identify and allocate the various expenses, payments, and disbursements associated with the sale of residential real estate between the buyer and the seller of the property.

3. A gift letter is a letter that verifies that all or part of a borrower's down payment toward the purchase of residential real estate is a gift from relatives or friends that does not have to be repaid.

4. The term "closing" is used in the real estate industry to refer to the event at which the legal transfer of real estate from seller to buyer takes place and at which funds are transferred between the various parties, such as from lender to buyer and from buyer to seller, and fees are paid to mortgage brokers, real estate agents, title agents, and others involved in the transactions.

5. CitiMortgage, Inc. was a mortgage lender located in O'Fallon, Missouri, that extended a loan to fund the purchase of a property involved in the fraudulent scheme alleged herein.

6. The defendant, MILDRED ANN RUSSELL, was a licensed mortgage broker and one of the owners of Liberty Mortgage Solutions, Inc. ("LMS"), a mortgage brokerage business located in Jacksonville, Florida. RUSSELL participated in the fraudulent scheme by obtaining and creating, and directing others to obtain and create, false and fraudulent documents and information, and providing the false and fraudulent documents and information to lenders to obtain mortgage loans for potential buyers of residential real estate.

B. Charge

From in or about December, 2006, through in or about July, 2009, in Jacksonville, in the Middle District of Florida, and elsewhere,

MILDRED ANN RUSSELL,

the defendant herein, did knowingly, willfully, and intentionally, combine, conspire, confederate, and agree with other persons known and unknown, to commit the following offenses against the United States, that is:

1. To use the United States Postal Service and commercial interstate carriers by depositing and causing to be deposited with, and by taking and receiving and causing to be taken and received from, such carriers certain matters and things, having devised and intended to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme and artifice and attempting to do so, in violation of Title 18, United States Code, Section 1341; and

2. To transmit and cause to be transmitted by wire in interstate commerce writings, signs, signals, pictures, sounds, and communications, having devised and intended to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, for the purpose of executing such scheme and artifice and attempting to do so, in violation of Title 18, United States Code, Section 1343.

### C. Manner and Means

1. It was part of the conspiracy that RUSSELL and other conspirators solicited persons to buy residential properties and to apply for and obtain mortgage loans through LMS.

2. It was further part of the conspiracy that RUSSELL and others working for her, with RUSSELL's knowledge and at her direction, completed, and caused to be completed, Form 1003 mortgage loan applications that set forth false financial

information pertaining to the borrowers' financial resources, such as bank account balances that were inflated or that did not exist.

3. It was further part of the conspiracy that RUSSELL and other conspirators, with RUSSELL's knowledge and at her direction, altered and created documents and caused the alteration and creation of documents, such as gift letters, that reflected false financial information pertaining to the borrowers' financial resources.

4. It was further part of the conspiracy that RUSSELL and others working for her, with RUSSELL's knowledge and at her direction, submitted the false financial information and fraudulent documents, and caused them to be submitted, to mortgage lenders to convince them to loan money on the properties to borrowers who would not have qualified for the loans, or who would have qualified for loans in a lesser amount, if true financial information was disclosed to the lenders.

5. It was further part of the conspiracy that documents related to the transactions, including documents containing false financial information, were often sent by U.S. mail and by commercial interstate carrier between and among the conspirators, buyers, lenders, title agencies, and others involved in the transactions.

6. It was further part of the conspiracy that documents related to the transactions, including documents containing false financial information, were often transmitted by wire, such as by facsimile transmission or electronic mail ("e-mail"), between and among the conspirators, buyers, lenders, title agencies, and others involved in the transactions.

7. It was further part of the conspiracy that, in some of the transactions, RUSSELL and other conspirators used funds from accounts under their control to

purchase an "Official Check" from a financial institution in the amount of funds that the buyer was required to pay at the closing or in the amount of funds that the buyer purportedly obtained as a gift to assist with the down payment on the property, with the check referencing the buyer as the remitter.

8. It was further part of the conspiracy that, when RUSSELL and other conspirators obtained an "Official Check" in the name of the buyer, they provided the check to the closing agent and represented that the funds were coming from the buyer.

9. It was further part of the conspiracy that, when RUSSELL and other conspirators provided an "Official Check" in the name of the buyer at the closing, the funds used to purchase the check were reimbursed to them at or shortly after the closing as part of the sales proceeds.

10. It was further part of the conspiracy that the conspirators' fraudulent acts caused mortgage lenders to disburse millions of dollars in loan funds, often through transfer by wire in interstate commerce, for the benefit of the buyers at the closings.

11. If was further part of the conspiracy that the conspirators' fraudulent acts caused a title agency, acting as closing agent, to disburse thousands of dollars from the loan funds to LMS as mortgage brokerage fees and to RUSSELL and other conspirators as proceeds from the sales.

12. It was further part of the conspiracy that the conspirators performed acts and made statements to hide and conceal and cause to be hidden and concealed the purpose of the conspiracy and the acts committed in furtherance thereof.

### D. Overt Acts

In furtherance of the conspiracy and to affect the objects thereof, the following overt acts, among others, were committed in the Middle District of Florida and elsewhere:

1. In or about December, 2007, and January, 2008, a buyer reached an agreement to purchase residential real estate located at 338 Belfort Street, Jacksonville, Florida, from RUSSELL and her husband, who together owned the property, for the purchase price of $110,000.

2. In or about January, 2008, RUSSELL completed, or caused to be completed, a Form 1003 mortgage loan application in the name of the buyer falsely stating that the buyer owned as an asset a gift of $11,000 and falsely stating that the Belfort Street property would be the buyer's primary residence.

3. In or about January, 2008, RUSSELL completed, or caused to be completed, a "Gift Letter" falsely stating that the buyer had received a gift of $11,000 from his brother.

4. On or about February 1, 2008, RUSSELL and the buyer went to a branch of a credit union at which RUSSELL and her husband had an account and RUSSELL withdrew $11,000, which she then gave to the buyer, who deposited the money in his account at the same credit union.

5. On or about February 1, 2008, the buyer paid the $11,000 back to RUSSELL from his account.

6. In or about February, 2008, an employee at a title agency, acting as closing agent, prepared a HUD-1 Settlement Statement, which RUSSELL signed as

one of the sellers, stating that the buyer would pay $11,814.78 at the closing on the Belfort Street property.

7. In or about February, 2008, RUSSELL, knowing that the information set forth in the documents was false, submitted, or directed someone else to submit, the fraudulent documents, including the Form 1003 and the gift letter, to CitiMortgage, Inc., to obtain a mortgage loan for the benefit of the buyer in the amount of $99,000 for the Belfort Street property.

8. In or about February, 2008, based at least in part on the false information set forth in the documents submitted by RUSSELL, CitiMortgage approved the loans for the Belfort Street property.

9. On or about February 7, 2008, CitiMortgage disbursed mortgage loan funds in the amount of $99,524.49 to the title agency, as closing agent, by wire transfer from O'Fallon, Missouri, to Jacksonville, Florida, to be used for the benefit of the buyer at the closing on the Belfort Street property.

10. On or about February 8, 2008, RUSSELL purchased an "Official Check" from the credit union at which she had an account, listing the buyer as the remitter of the check, in the amount of $11,814.78, which was the amount reflected on the HUD-1 that the buyer was to pay at the closing on the Belfort Street property.

11. On or about February 8, 2008, a closing on the Belfort Street property was conducted by an employee at a title agency acting as closing agent.

12. On or about February 8, 2008, at the closing, RUSSELL submitted the "Official Check" in the amount of $11,814.78 to the title agency, as closing agent, representing that the funds came from the buyer.

13. On or about February 8, 2008, the title agency, as closing agent, disbursed funds in the amount of $28,844.33 to RUSSELL and her husband by wire transfer for proceeds of the sale of the Belfort Street property.

14. On or about February 8, 2008, the title agency, as closing agent, disbursed funds in the amount of $2,775 to LMS by wire transfer for mortgage broker fees.

15. On or about February 8, 2008, an employee of the title agency, as closing agent, sent documents from the closing by U.S. mail (Postal Service) from Jacksonville, Florida, to CitiMortgage in O'Fallon, Missouri.

All in violation of Title 18, United States Code, Section 371.

## FORFEITURES

1. The allegations contained in Count One of this Information are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to the provisions of Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2)(A), and Title 28, United States Code, Section 2461(c).

2. From her engagement in the violations alleged in Count One of this Information, the defendant, MILDRED ANN RUSSELL, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2)(A), and Title 28, United States Code, Section 2461(c), all of her interest in any property constituting or derived from proceeds obtained directly or indirectly as a result of the said violations, including but not limited to a sum of money equal to

approximately $285,940 in U.S. currency, which represents the approximate proceeds the defendant obtained as a result of the offense.

       3.    If any of the property described above, as a result of any act or omission of the defendant:

       a.    cannot be located upon the exercise of due diligence;

       b.    has been transferred or sold to, or deposited with, a third party;

       c.    has been placed beyond the jurisdiction of the court;

       d.    has been substantially diminished in value; or

       e.    has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

A. BRIAN ALBRITTON
United States Attorney

By: ARNOLD B. CORSMEIER
Assistant United States Attorney

By: MAC D. HEAVENER, III
Assistant United States Attorney
Deputy Chief, Jacksonville Division